May it please the Court, I'm Robert Jobe, and I'm appearing today on behalf of Petitioner Cagendra Khadka, whose testimony was rejected as incredible by an immigration judge in San Francisco, California. The problem from our perspective with the immigration judge's analysis is that each and every one of the reasons that he gave in support of his adverse credibility hinges on a misapprehension of the evidence. This begins on page 142 of the record where the immigration judge says that the evidence that was presented by the government established that the respondent was an ordinary policeman who had no history of special assignments to engage or fight Maoist insurgents or terrorists. He says the same thing on page 145 at the bottom of that page where he says the government has rebutted that the respondent was anything other than a plain policeman, that the respondent served in or as head of a special anti-terrorist unit such as a striking commander to fight the Maoists. Now the government's own evidence on this point, however, because they obtained this petitioner's employment history from India, this is on page 791, but the government's own evidence makes clear that he was deployed as a striking commander to Chitwan District and also he was deployed as a striking commander to another district right below that. It also says that in 1997 he was transferred to an anti-terrorist unit. Bottom line is the judge is just simply wrong on this point, as he was on every one of these assertions that he makes here. The next thing he says is that there's no record of Maoist threats against the respondent, notwithstanding the fact that this petitioner claimed that he reported the problems that he was having with the Maoists to the police. But he never claimed to have reported these threats to the police, and that's crystal clear on page 222 of the record where he was asked, did you report this? And he explicitly said, no, I did not, and he goes on to explain why he did not. The third thing the immigration judge says is that the embassy's own comprehensive newspaper archives don't corroborate either of the two Maoist encounters that the respondent testified to. The judge is talking about encounters described in this newspaper article or sort of insinuated by this newspaper article. He never testified that there were encounters on those dates. He clearly testified that the dates in the newspaper article were the dates that he was transferred to the various districts as a striking commander. Again, this hinges entirely on a misapprehension of fact. The next one is the big one, and this hinges, this is about the newspaper article. Here, there are a couple things. I mean, first off, there's an issue about whether the State Department witness who testified here had gone to the press archives in Nepal personally and determined that this article was not in the press archives, and then returned and discovered that it was there. Twice in his decision, the immigration judge says that the witness personally went and found that this article was not in the press archives. That's not the evidence. The witness testified that he went one time, and actually when he went, the article at issue was in the press archives. He located the article in the press archives. The judge is confusing this testimony because what he actually said is that in these other occasions, two other occasions, two people went, but they didn't locate it. But the witness himself, the only time he went, he found the article. The bigger thing with regard to the newspaper article, though, is the judge's misapprehension of Judge Adams' testimony, because I think this is a very important point, but he, this is on page 138, 139 of the record. He says that Judge Adams testified that Tarun occasionally published two different editions to appeal to different segments of the population. Now, that's not at all what Dr. Adams testified to. What he said, and this is on page 344 of the record, what he said was that the Tarun occasionally published a separate edition, but it was to control the management of their circulation. He testified that according to the publisher, the concern was that certain newspapers were being sold outside the district, essentially. They wanted to know whether the newspapers that were being distributed to Kathmandu were being sold outside that. And so as an internal sort of auditing procedure, they developed, they would occasionally publish two versions to track where those newspapers were actually being distributed and sold. This is kind of an important point because the judge goes on to say in his decision, you know, that it's hard to understand why this one article would have been substituted for another when the article that was taken out related to the outside the valley. But that misses the point. The idea, the purpose here in having this separate edition was not to appeal to any particular readership. It was an internal thing that allowed them to keep track of where these newspapers were being distributed. Say that again. It was an internal thing that allowed them to keep track of where these newspapers were being distributed.  This is laid out, Your Honor, in some detail on page 344 of the record. It's the only explanation in the record from Dr. Adams about why there were two separate versions of the newspaper. And he got this directly from the publisher. And he says the publisher recounted that this was an internal sort of management thing that allowed them to keep track of where newspapers were developed, where they were being distributed. They had two separate editions because they were concerned that some of their distributors essentially were taking newspapers that were intended for one area and selling them, you know, perhaps off the record in other parts of the country. And this was intended to track the location of where these newspapers were being distributed. Now, this is important because the State Department presented these witnesses saying, well, there's only one edition of this newspaper. Well, yeah, that's true generally. But for internal recordkeeping purposes, you know, the publisher said, we occasionally do this. It's not the kind of thing that you would expect the witnesses that the State Department brought in here to even know about because it's true. There is only one formal edition of the newspaper. But for internal bookkeeping purposes, they did this occasionally. And the bottom line here, though, is that this explanation that was put forth was misapprehended by the immigration judge. If he'd understood the explanation, he may well have come to a different conclusion. But again, he misapprehended the evidence on this important point. And it's for this reason that I think the case has to go back for a new credibility finding. It's just that every single point... Yes, Your Honor. Excuse me. Pardon me? Let me ask you a couple of questions about this. Yes. One is, how many times did they publish a separate edition in order to make this determination? More than once? It's impossible for us to really know from the record, Your Honor. And I say that because, you know, the way the State Department presented its case, you know, the witness kept testifying that there's only one edition of this newspaper. We get that. I understand that. But there... I guess what I'm trying to say is that the State Department witness who testified, unless he'd spoken with the publisher, he wouldn't know that occasionally they printed this special edition in order to keep track of their distribution. But we don't know... We don't know what occasionally... There's only one time that anybody is found. They only... The State Department only looked through one year's periodicals and they found just this one instance. But again... Why would they have... Excuse me. Why would they have changed one article in this second edition? Yeah. You know, according to the publisher, and the only reason given here, and this is on page 344, again, Your Honor, is that they made slight changes in the newspaper so that they could track... So that they could have two different versions to track where these various newspapers were being distributed. The bottom line here, Your Honor, is I don't think that, you know, this is the... I don't think the best way to examine this case is, you know, is the evidence so compelling as to require reversal here? I think, ultimately, my problem with the case is that each and every one of these points that the immigration judge raised, each and every single one of them, he misstates the evidence at issue here. With regard to this, he misstates Dr. Adams' explanation as to why there are two versions of the newspaper. He's essentially trying to choose between Dr. Adams' testimony and the State Department's witness in terms of why there would be these two versions of the newspaper. If you're going to make a choice between these two competing testimonies, it seems like you have to at least understand the competing testimony. And the problem is that the immigration judge didn't. He misunderstood on each and every one of these points, and this is such an important point for him to misunderstand that I think it requires, in combination with the other Could I ask you a question about responsibility for the article? Did your client take responsibility, or in what sense is he the one responsible for the article appearing? Well, he obviously obtained the article and at some point presented it, but obviously his testimony, you know, there's part of the transcript seems to be missing here, you know, but his testimony, you know, has been that the article is a bona fide one. It's a true and correct copy of an article that was published in this Nepali newspaper. And that's obviously supported by the fact that it was found in the press archives. The publisher confirmed its existence. So there's nothing to the contrary to show that he was aware of it. Yeah, that he would have known that this was not a true, no, there's nothing like that in the record. Okay. Thank you, counsel. Thank you. We'll give you a minute for rebuttal. Ms. Miles? Good morning, your honors. The court should deny this petition for review because the evidence in the record does not compel the conclusion that Khadka met his burden of presenting a credible claim for asylum from Nepal. After considering extensive testimony by Khadka, Khadka's declaration and asylum application, his own witness, and a government expert, the immigration judge reasonably concluded that Khadka knowingly submitted a fraudulent article that was submitted to corroborate essential elements of his asylum claim. This submission alone of a fake article. What's the best evidence on that, that he knowingly submitted? He knows he submitted it and he maintains that it's genuine. So he's maintaining a story that it's genuine. So he's knowingly submitting this article in furtherance of his asylum application and purporting that it is a true article. But the article on its face is false. And we also have expert witness testimony. How do we know on its face that it's false? Well, if you compare the article to his testimony alone and to his declaration in support of his application alone, it's false. It conflicts with his testimony and his declaration. He stated in his declaration that he was deputed on those two dates mentioned, the June 98 and July 99 dates. He stated that he was deputed on those dates, but never once did he have any incidents with any Maoists until a date in October. His own testimony establishes his one and only time, yet this article states that he The article is talking about deaths to Maoists on those two particular dates. On its face, it conflicts with his testimony and his declaration. And the article doesn't mention the one and only time that he has claimed during testimony and in his declaration that he actually did encounter Maoists. The article doesn't even mention this alleged incident that gave rise to why they're going after him. And a third, a third on its face fact that's wrong compared to his testimony and the declaration is saying the article was dated September 30th, 2002. And it states that his wife and children had already moved out of the home due to threats. Yet his own testimony and his declaration state a date after, October 5th, she received threats. She was still living in the home and moved. If there are conflicts between the article and his declaration, wouldn't that tend to show that the article might be more genuine? I mean, one would assume if you're going to gin up an article, it's going to be fraudulent. It would be consistent with testimony. So doesn't your argument kind of cut the other way? I don't, I would not say that because. Your argument is you can tell that the article is fraudulent by just looking at it. And I guess I'm not following that. And your argument is that because it's different from the testimony, therefore it must be fraudulent. I don't, I can't, I'm having trouble making that logical. The article doesn't track any testimony that actually pertains to his claim. So it doesn't completely support any of his testimony that he's ever presented in support of his claim. But in addition, we have extensive witness testimony that given the witness's expertise with Nepalese asylum claims, expertise in examining fraudulent documents, he provided more evidence as to why on its face it's fraudulent as well as given the circumstances in this case. And on its. When you say, maybe we're just miscommunicating. When you say on its face, I assume there's something you could look at the document and you can see it's fraudulent. But that's not exactly what we have here. The only. Sure. Maybe, maybe you can correct me, but it seems to me without the State Department testimony, there's nothing you can really look at the article and say it's right or wrong. Now the State Department testimony and others is a different matter. Well, the, what I was talking about on its face, you can look at it and determine that it's inconsistent. And then that. Sure. Most people think that the newspapers don't always get it exactly right. That doesn't necessarily mean that their version is wrong or that the, any newspaper article is fraudulent. It means that. It was significantly materially different, but that alone triggers a question that it's inconsistent with his own testimony and declaration. But then again, we have this solid expert testimony. Can I pursue the question of fraud? Now, there's no doubt that this newspaper printed this article, isn't it? No. In the immigration judges. They printed this article. That the newspaper printed it. It's that's, that was not an established fact here. It was established that there was a version, this second version that was printed by whom he claims it was printed by the newspaper. The state department's claiming that it was just a political faction that had connections and was able to slip this one new version into files where it's only physically located in one place at the newspapers files. It's not in the Federation of newspapers in Nepal's files. It was only in one location. So it's questionable even as to who printed it. But here in the expert's opinion, it was printed by a political faction. Mr. Khadka has connections. His brother-in-law is a person that's very high ranking. Let me ask you this. If an applicant for asylum has a powerful ally who tries to help him out, does that disqualify the applicant? He's disqualified by the fact that he knew he was being helped out, that he knew a fraudulent article was being made on his behalf, and that he submitted it in support of his application. Your evidence that he knew all that is based on what? That he's claiming it's real. And it's obviously not. He's just trying to have a battle of experts or opinions here. If it's established that it's false, it's a given that he knew it was fraudulent. If we believe the State Department man, you've got a point. But does he have to believe that? Here, sufficiently, he just didn't provide sufficient or substantial evidence to overcome the government witness's testimony. No, but let's say he does not refute the State Department. What does it show about his own knowledge? If he does not, it sounds like it went off. Excuse me. If he does not refute the State Department, is that your question? That's right. What does it show as to his intent to perpetrate a fraud? If he does not refute, that just shows that he's, to the immigration judge, trying to continue on with the claim that his article is real. Well, what evidence, maybe put it a different way, what evidence connects him to the placement of the article except circumstantial evidence? I mean, the alternate theory, assuming that it's a fraudulent document, is maybe somebody's trying to help him, they say, look, there's a newspaper article that supports your case. Is there anything in the record that connects him to the article directly except circumstantial evidence? Nothing direct, but strong circumstantial evidence, including his relationship. So you've got circumstantial evidence on one end. We have then the counter theory that this was a double publication day. You know, that's what the expert said, right? His expert maintained it's a true double publication. Okay. So I'm heading to a different point here. How do we get from all of that dispute to a clear and convincing finding of frivolousness? Of frivolousness? Yeah. Well, between that and the fact that other evidence in the record certainly does not compel that he is credible. No, but that's just an ordinary credibility. Sure. But under the board's decision in matter of YL, which this court in 2008 affirmed, that standard in Ahir versus Mukasey. So the standard, as set by the board and affirmed by this court, is as long as the applicant has a notice of the consequences of filing a frivolous application, and he did, that's not at issue here, as long as the agency found that he knowingly filed a frivolous application, we have that. The agency found he knowingly filed it. And the findings must just be supported by a preponderance of the evidence. And this is a change in the board's standards. It's no longer necessary that it be extrinsic evidence or that there be an admission of untruthfulness. Right. But the standard is, I take your point. I was, what I was, I misstated. But the IJ has to provide cogent and convincing reasons for finding that he knowingly and unknowingly submitted the claim. So we have a dispute of evidence. He, as Mr. Job has indicated, his, much of his reasoning doesn't seem to be supported by the record. How do we get to a finding of frivolousness that we can sustain? Because it is sufficient, once the immigration judge determines by, through substantial evidence, that somebody submitted a fraudulent document that goes to the heart of the claim, that alone is enough to determine that the rest of the individual's credibility is in question. The immigration judge is entitled to determine that all of his credibility has been undermined. And at what point did the IJ tell the petitioner that he was considering a finding of frivolousness?  So he knew that that was always a risk. The standard warning they give in every case? Yes, the standard warning. And notice was not contested in this case. Notice is a given that he was aware of the consequences of filing a frivolous application. And the IJ then rendered that determination through the regular course of rendering his decision. Okay. Our questions have taken you over time. Any further questions from the panel? I have something to say to Ms. Miles. Sure. You probably don't know my customs, but I've been on this court for a good many years. And for me, it's very important to know where the lawyer has gone to school and when he was admitted to the bar. Now, with persons in private practice, that information is available. But if they're working for the government, it's not so available. So I've had the custom of having a law clerk or extern call the government lawyer and get that data. And I understand that you consider that an invasion of your privacy. I'm sorry if that was the case, but is there some reason that you want to conceal those facts? No. I provided my law schools, but I said I was uncomfortable with providing birth date or date of admission to the bar. I asked why those questions were being asked. Your law clerks indicated that you like to have a profile. I found from experience that lawsuits are not just the parties who we can't see. They're also the lawyers we can see. Sure. Mr. Jobe has been before us a number of times. I have great confidence in him. You've never been. Oh, I have. Actually, you have my information. You've called me two years ago and had all that information. Well, if our systems were better, we already have it. But that's – I don't want to upset you by asking for something you don't want to reveal. But anyway, that has been my custom. You aren't singled out for it. Sure. I understand. I think Judge Noonan is just saying his call was innocuous and he didn't mean it. He didn't mean for you to take any offense. No offense taken. Thank you. I'm assuming. Just again. Of all the reasons that the immigration judge set forth in his decision – I can't hear you. Okay. I'm not hearing the lawyer. No? We'll try again. Of all the reasons that the immigration judge set forth – Sorry, I'm not hearing you. I'm not hearing you from that microphone. Where did the technicians go? Oh, I bet you I hit the switch with my pad. Now can you hear me? All right. Of all the reasons that the immigration judge set forth to justify his adverse credibility finding, the government declined to defend any of them in its brief except this one relating to the letter or the newspaper article. And again, I mean, what I find troubling about this is you have two competing explanations as to how this came about. And the judge has some discretion to choose which of those two he believes. But before a judge can make a determination like that, he needs to understand at least what the two theories are. And here, the immigration judge didn't. He misapprehended the theory of our expert witness. And for that reason, I don't think that at this point the court can uphold an adverse credibility finding based on the judge's discussion with regard to this newspaper article. It's got to go back so that – because none of the other reasons are supported. This one here, it hinges on a misapprehension of the theory that was put forth. And the judge can't choose one theory over another if he doesn't even understand the second theory. And for that reason, I think this case has to go back. Thank you for your argument. Thank you both for your presentations. The case just heard will be submitted for decision.
judges: Hall, Noonan, Thomas